Gerti Muho
Pro-Se
1100 Biscayne Blvd. 5303
Miami, Florida 33132
Phone: + 1 212 480 00 01
Facsimile: + 1 888 292 73 95
gm@gmcapital.net



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8 6 14

------------------------------------------------------x
SOUNDVIEW ELITE LTD., AND
VANQUISH LTD.,

                                    Plaintiffs,

-against-

GERTI MUHO, AND
LEVERAGED HAWK, INC.
                                    Defendants.
------------------------------------------------------x

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW**
**YORK**
**Civil Action No. 13 CV 06895 (AT)**

## MOTION TO VACATE DEFAULT JUDGEMENT AND DISMISS THIS CASE WITH PREJUDICE AS VOID

Defendant Gerti Muho, acting pro-se, (hereinafter "Gerti Muho") moves this court, by

Magistrate Judge Kevin Nathanial Fox, the only designated Judge in this case, to vacate the

default judgement against Defendant pursuant to Federal Rules of Civil Procedure Rules 60(b)

(1),(2),(3),(4), and (6). Gerti Muho additionally moves to vacate the Ex-Parte Temporary

Restraining Order against him as being void for being contrary to the Federal Rules of Civil

Procedure and defendant's substantive rights to due process. And additionally, Gerti Muho

moves to dismiss the action against him in entirety as void for lacking in Federal Diversity

Subject Matter Jurisdiction, Personal Jurisdiction over him, a florida resident, and for inflicting

deprivation on him of his right to substantial due process. Gerti Muho asks that the court regard

his pleadings with the special solicitude afforded pr-se parties, see Traguth v. Zuck, 719 F.2d 90,

95 (2d Cir. 1983).

## I. DISTRICT JUDGE ANALISA TORRES WAS NEVER ASSAIGNED, DESIGNATED OR APPOINTED TO HEAR THE CASE, AND HER ACTIONS THERE ARE WITHOUT LEGAL ᴀ EFFECT

*Authority*

Magistrate Judge Kevin Nathaniel Fox was assaigned to the case on 9/27/2013. The Civil

Case Cover Sheet that must be affixed to service of the summons and complaint and must be

filed with the court listed Magistrate Judge Kevin Nathaniel Fox as the Judge designated to the

case. This cover sheet was, for some reason or another, never filed with the court by Plaintiffs

*From the complaint Gerti Muho's 90 year old grandma r recieved*

and a copy is in possession of Gerti Muho ˅ and is affixed to this motion as exhibit A.

For some reason or another, District Judge Analisa Torres' (hereinafter "Judge Torres")

name is stamped on documents filed with the court on the same day and every day since. A copy

of the the relevant pages of the complaint filed on the same date bearing Judge Torres' name is

affixed to this motion as exhibit B. There is no rational, reasonable, or lawful explaination for

this fact. There is no record of Judge Torres ever being assigned to the case, appointed by any

lawful procedure, or by any relevant local court rule or method. It appears that different

documents to those served have been filed with the court.

*assigned, authorized, or*

Therefore Judge Analisa Torres was not the Judge ˅ empowered by law to act as Judge in

this case. As such, all the actions taken by her are entirely void and without effect. For these

reasons, Gerti Muho asks that the Default Judgement and all other actions by Judge Torres be vacated under FRCP Rules 60(3), (4) and (6).

## II. THE DISTRICT COURT LACKS DIVERSITY SUBJECT MATTER JURISDICTION AND AS SUCH THE EX-PARTE TEMPORARY RESTRAINING ORDER, DEFAULT JUDGEMENT, AND ALL OTHER ACTIONS OF THIS COURT ARE VOID

Plaintiffs allege in their complaint that Defendant Gerti Muho is a New York resident and that Leveraged Hawk, Inc. has its principal place of business in New York. (see Exhibits A and B) The relevant SEC filings ^and NY State for Leveraged Hawk, Inc. lists its principal place of business as being in New York (see Exhibit C). While it is true that Plaintiffs' couched their pleading of Diversity in "and/or" language, (see Exhibit B) Leveraged Hawk, Inc., is a citizen of both Delaware and New York by virtue of state of incorporation and principal place of business, respectively. See 28 U.S.C § 1332(c)(1). And in any case Plaintiffs' failed to allege with the required specificity that Leveraged Hawk was not a citizen of New York. See Brown v. Keene, 33 U.S. 112 (1834) and  Grace v. American Cent. Ins. Co., 3 S.Ct. 207, 210+, U.S.N.Y. (1883).

Although Plaintiffs assert that they are foreign corporations, Bankruptcy Judge Robert E. Gerber (hereinafter "Judge Gerber") ruled that Plaintiffs were citizens of New York for the purpose of Jurisdiction when he ruled in relevant part that "no reasonable court could now find the Debtors' COMI [Center of main interests] to be other than in the United States, at their principal place of business at 48 Wall Street [New York, New York 10005]." In re Soundview Elite, Ltd., 503 B.R. 571, 594 (Bankr. S.D.N.Y. 2014), and, on the merits of the Plaintiff(s) domicile rules "that their principal place of business is in the United States, at 48 Wall Street, in New York, New York, and that if a

chapter 15 case with respect to them now were filed, their "center of main interests," or "COMI,"

would now be in New York as well." Id. at 571. (see Exhibit D). *Thereby evicerating diversity and legality.*

Diversity Jurisdiction must be plead with specificity in the complaint (Id.). The complaint

was never ammended. In January, while the case was ongoing, a bankruptcy judge, Judge

Gerber, found that both Plaintiffs had their Principal place of business in New York. Gerti Muho

*Which Plaintiffs agree on,*

cited that decision in his filings. Res Judicata makes Judge Gerber's finding of fact binding on

the parties. The facts on which the decision was based were in existence prior to the date that

filing of the complaint. At least one Plaintiff and at least one Defendant, either Gerti Muho or

*alleged and/or found*

Leveraged Hawk, Inc., were simultaneously citizens of New York at the time of filing and during

the pendency of this case. In any case Plaintiffs' failed to show Diversity of the parties in their

pleadings by alleging that both Defendants were New York citizens while both Plaintiffs were in

fact New York citizens. Therefore there was no Diversity between the parties and the District

*authority or legality*

Court lacked Subject Matter Jurisdiction. As such all actions in this court are void. See 28 U.S.C.

1338(a)(1), (2), (c)(1).

## III. THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER FLORIDA RESIDENT GERTI MUHO

In his first Filing with the Court on Febuary 28, 2014 Gerti Muho challenged the Personal

Jurisdiction against him. (see Exhibit E) Gerti Muho re-asserts all the grounds of that motion as

if made in this motion. Additionally Gerti Muho re-asserts all grounds of that motion for all the

other purposes of this motion to vacate and dismiss. This court lacks in personam jurisdiction

over Gerti Muho because he was never served with process at his residence in Florida, where he

is a citizen.

Plaintiffs alleged serving Gerti Muho in New York at his grandmother's house. Gerti Muho challenged personal jurisdiction on the grounds that his grandmother was not authorized to accept process for him and that he did not reside at his grandmother's house. Therefore Gerti Muho never aknowledged service of process by mail and immediately challenged personal jurisdiction. For this reason this court lacks jurisdiction and the default judgement is void. See Armco, Inc., v Penrod-Stauffer Bldg. Sys., Inc., 733 F.2d 1087, 1089 (4th Cir. 1984) (where defendant did not aknowledge service by mail, "there was no valid service of process, the district court was without jurisdiction of the defendant, and the default judgement was void"). Where Judge Torres ruled that Gerti Muho was a Florida citizen on April 3, 2014, she doomed personal jurisdiction by res judicata because that proves Gerti Muho was never served with process. Gerti Muho also argued then, and now, that he could not be served with process by e-mail.

For these reasons the court lacked personal jurisdiction over Gerti Muho and the default judgement was void. Consequently the default judgement should be vacated and this case dismissed.

## IV. THE EX-PARTE TEMPORARY RESTRAINING ORDER WAS ISSUED CONTRARY TO THE RULES OF CIVIL PROCEDURE AND DEFENDANT'S RIGHTS TO SUBSTANTIAL DUE PROCESS

Rule of Civil Procedure 65(b)(1)(a) requires that an application for Ex-Parte Temporary Restraining Order to freeze a Gerti Muho's assets be supported an affidavit of persons who have non-hearsay personal knowledge of an "emergency" that justifies issuing the order. Plaintiffs filed three affidavits in support for their application: 1) The affidavit of Floyd Saunders, where

Floyd Saunders swears under oath that his personal knowledge derives from hearsay information from his associates (Exhibit F), 2) The affidavit of Peter Harvey, Plaintiff's counsel, which is irrelevant because Counsel is not a party and does not swear on personal knowledge, and 3) The affidavit of Jane Metcalf, an associate at Plaintiff's Counsel's law firm, where Jane Metcalf swears in support of an "emergent" motion that the situation which necessitated an Ex-Parte TRO was based on her personal knowledge of being in a telephone conference with a Delaware Superior Court Judge where Gerti Muho was also present and Gerti Muho was told he cannot represent Leveraged Hawk, Inc. pro-se and the fact that Gerti Muho was seeking to hire lawyers.

None of the affidavits Plaintiffs filed are sufficient under the Rules of Civil Procedure. Floyd Saunders merely swears that he heard hearsay evidence from his associates, and based his sworn testimony on that hearsay. Specifically, Floyd Saunders swears that he was informed of the facts he swears to on personal knowledge by his "associates". Such an affidavit would not be admissible evidence where it to be introduced at trial, and could not even support summary judgement because it is inadmissible hearsay.

Peter Harvey's Affidavit cannot support a request for an Ex-Parte TRO because he is Plaintiff's Counsel, does not swear on personal information, and is not a party.

Jane Metcalf's affidavit does not meet the standard to support an application for an Ex-Parte TRO, first because as an attorney working for Plaintiff's Counsel she is Plaintiff's Counsel, and secondly because she never swore on personal knowledge that an "emergency" situation existed. All that she swore was that her affidavit was in support of an "emergent" motion, and that she was present during a telephone conference of the Delaware Superior Court where Gerti

Muho was told he could not represent Leveraged Hawk, Inc. Pro-Se, and Ms. Metcalf's personal knowledge that Defendant was seeking to hire lawyers.

No reasonable court could find that any of the affadavits submitted by Plaintiff, or their non-verified complaint could support the granting of an Ex-Parte TRO and attachment. This attachment deprived Gerti Muho of his ability to obtain representation and properly defend himself, or to be heard to argue against the TRO or the merits of the case. Thus Defendant's right to substantial due process was violated by the granting of the Ex-Parte TRO. The Ex-Parte TRO was also granted contrary to the Rules of Civil Procedure. Therefore all subsequent actions in this court, including the default judgement are void as contrary to Defendant's right to due process. Defendant asks this court to vacate the Default Judgement on these grounds.

**IV. DISTRICT JUDGE ANALISA TORRES—EVEN IF SHE HAD BEEN DULY ASSIGNED TO THIS CASE, AND SHE WASN'T—IGNORED AND DISREGARDED NUMEROUS CONFLICTS OF INTEREST THAT EACH REQUIRED HER RECUSAL AND DISQUALIFICATION FROM ADJUDICATING THIS CASE.**

Upon Information and belief, District Judge Analisa Torres is or was married or engaged to be married to a Mr. Constantino "Tino" Argimon (hereinafter "Mr. Argimon") (Exhibit G). Upon Information and belief, Mr. Argimon is a co-director with David E. Shaw (hereinafter Mr. Shaw) on an investment board that has dealings with Plaintiff Soundview Elite, Ltd., or Alphonse "Buddy" Fletcher, an adverse party adverse to Defendant and Leveraged hawk, Inc. and other parties relevant to this proceeding, including the Bankruptcy Action before Judge Gerber. (Exhibit H). Mr. Shaw is a party that is adverse to Defendant and Leveraged hawk, Inc.

and other parties relevant to this proceeding, including the Bankruptcy Action before Judge

Gerber. (Exhibit H) *Also, Judge Torres' only stint in private paid labor was at Patterson Belknap Webb Tyler LLP, which she did not disclose.*

Canon 3(c) of the Code of Conduct For United States Judges states in relevant part that

"A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality

might reasonably be questioned" (Canon 3(c)(1)). Because of Torres' relationship to Mr.

Argimon severe questions arise as to her impartiality, her prejudiced knowledge of the parties in

this case, her prejudiced knowledge of facts surrounding this case, and any personal interest she

may have had in this case.

Judge Torres should have either disqualified or recused herself from this case, or should

have at least disclosed this possible conflict pursuant to Canon 3(d) of the Code of Conduct For

United States Judges. Judge Torres did none of these things, and Defendant only learned of the

information and facts relevant to this issue relatively recently. Because of the serious question of

judicial impropriety that Torres' relationships has created, her Judgements must be reviewed in

this case, and her order of a Default Judgement set aside and vacated.

## VI. DEFAULT JUDGEMENT SHOULD BE VACATED BECAUSE GERTI MUHO ANSWERED ON THE MERITS AND ALLEGED FACTS THAT NECESSITATED A TRIAL ON THE MERITS

Gerti Muho, is his Motion of Febuary 28, 2014 (Exhibit E), fully re-alleged as if made

here, specifically raises issues and facts that dispute Plaintiffs' allegations in their complaint.

Specifically Gerti Muho attacked the Plaintiffs' standing, the insufficiency of Plaintiffs' claim of

Subject Matter jurisdiction, in personam jurisdiction and the merits of the case by virtue of the Plaintiffs no longer being in existence and their remains being under Gerti Muho's sole control.

Judge Torres ruled that this filing by a pro-se defendant was frivolous, without any explaination save a citation to a Westlaw-only case that was from a non-binding jurisdiction that concerned itself a corrupt judge. Judge Torres should have provided some or any explaination for her action, or made some ruling on the substance of Defendant's arguments. Judge Torres gave the pro-se Defendant no explaination as to why she had deemed his filing frivolous or how he could fix it. This failed to afford Gerti Muho, pro se, due process, a fair trial, or the solicidtude afforded to pro se litigants.

The subsequent Default Judgement is nonsensical. Gerti Muho's assertions of substantive and procedural defenses based on facts at issue cannot possibly be frivolous. Because Gerti Muho actually answered, and raised issues against Plaintiffs' complaint, it is impossible for Gerti Muho to default. The court was obligated as a matter of law to decide those issues at trial. Gerti Muho did, in actuality, answer Plaintiffs' Complaint and was not in default. Defendant has been denied his due process and his right to a trial on the merits. Defendant has been summarily deemed guilty with no findings of fact against him whatever.

For these reasons, and based on the totality of the record, the Default Judgement against Defendant must be vacated in the interests of justice.

**CONCLUSION**

For all the reasons stated herein, and based on the totality of the record, Plaintiff asks this court to Vacate the Default Judgement against him. Defendant further asks this court to find that the proceeding was void for lack of Jurisdiction and for being contrary to the Rules of Civil Procedure and for violating his constitutional rights to substantive due process.

Gerti Muho, pro se

# EXHIBIT A

**(PLACE AN x IN ONE BOX ONLY)**                                                          **ORIGIN**

☒ 1 Original Proceeding     ☐ 2 Removed from State Court     ☐ 3 Remanded from Appellate Court     ☐ 4 Reinstated or Reopened     ☐ 5 Transferred from (Specify District)     ☐ 6 Multidistrict Litigation     ☐ 7 Appeal to District Judge from Magistrate Judge Judgment

☐ a. all parties represented

☐ b. At least one party is pro se.

**(PLACE AN x IN ONE BOX ONLY)**          **BASIS OF JURISDICTION**          **IF DIVERSITY, INDICATE CITIZENSHIP BELOW.**
(28 USC 1332, 1441)

☐ 1 U.S. PLAINTIFF     ☐ 2 U.S. DEFENDANT     ☐ 3 FEDERAL QUESTION (U.S. NOT A PARTY)     ☒ 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF DEF | | PTF DEF | | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 [X]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [X]3 [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 [ ]5 |
| CITIZEN OF ANOTHER STATE | [ ]2 [ ]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 [ ]4 | FOREIGN NATION | [ ]6 [ ]6 |

**PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)**

Soundview Elite, Ltd. and Vanquish Fund, Ltd.
dms Corporate Services Ltd.,
dms House, 20 Genesis Close
Grand Cayman KY1-1108

**DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)**

Gerti Muho                                              Leveraged Hawk, Inc.
20 Exchange Place, 4504                                 1679 South DuPont Highway, Suite 100,
New York, New York 10005                                Dover, Delaware 19901

**DEFENDANT(S) ADDRESS UNKNOWN**
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:     THIS ACTION SHOULD BE ASSIGNED TO:     ☐ WHITE PLAINS     ☒ MANHATTAN
(DO NOT check either box if this is a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.)

DATE 4/27/13     SIGNATURE OF ATTORNEY OF RECORD          ADMITTED TO PRACTICE IN THIS DISTRICT
                                                          [ ] NO
RECEIPT #                                                 [X] YES (DATE ADMITTED Mo. June   Yr. 1994 )
                                                          Attorney Bar Code # PH7368

Magistrate Judge is to be designated by the Clerk of the Court.     MAG. JUDGE K. FOX

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

# EXHIBIT B

JUDGE TORRES

**13 CIV 6895**

Peter C. Harvey
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Phone: (212) 336.2810
Facsimile: (212) 226.2222
Email: pcharvey@pbwt.com

*Attorneys for Plaintiffs Soundview Elite LTD.,
and Vanquish Fund Ltd.*

- - - - - - - - - - - - - - - - - - - - - - - - x: **UNITED STATES DISTRICT COURT**
                                     : **SOUTHERN DISTRICT OF NEW YORK**

SOUNDVIEW ELITE LTD., and
VANQUISH FUND LTD.,

              Plaintiffs,    :  Civil Action No.

        -against-

GERTI MUHO and LEVERAGED     :  **COMPLAINT**
HAWK, INC.

          Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - x

*(stamp: RECEIVED SEP 27 2013 U.S.D.C. S.D.N.Y. CASHIERS)*

## Preliminary Statement

Plaintiffs Soundview Elite Ltd. and Vanquish Fund Ltd. (collectively, "the

Funds"), by and through their attorneys, Patterson Belknap Webb & Tyler LLP, bring this action

against Defendants Gerti Muho and Leveraged Hawk, Inc. ("Leveraged Hawk") for conversion

and unjust enrichment arising from Defendant Muho's illegal transfer of over $2,000,0000 from

the Funds' bank account for his own benefit.

This case concerns a disgruntled former business associate and director who, upon

departing from the Funds, attempted to wrest control of the Funds and their assets by creating a

6424199v.1

series of bogus merger documents and contacting banking institutions at which the Funds
maintained their accounts to effectuate illegal transfers to Leveraged Hawk. Muho succeeded in
doing just that when, on August 8, 2013, he effected a wire transfer of over $2 million dollars
from accounts held by the Funds from a Monaco branch of HSBC Bank to Leveraged Hawk.
The Funds have demanded the return of these funds from both Muho and Leveraged Hawk. No
funds have been returned. The Funds also have reported Defendants' conduct to law
enforcement authorities. Having been substantially harmed by this unauthorized and unlawful
interference with their possessory rights, Plaintiffs assert claims for conversion, seeking
damages, restitution and other remedies the Court deems just and proper.

## PARTIES

1.  Plaintiffs, the Funds, form part of a larger group of affiliated investment
funds located in the British Virgin Islands and the Cayman Islands. Both of the plaintiffs are
citizens of foreign States. Soundview Elite Ltd. and Vanguish Funds Ltd. are organized and
exist under the laws of the Cayman Islands, and are located in that country. The address of the
Cayman Islands Funds is dms Corporate Services Ltd., dms House, 20 Genesis Close, Grand
Cayman KY1-1108.

2.  Defendant Gerti Muho is a United States citizen and a New York resident
having an address at 20 Exchange Place, 4504, New York, New York 10005.

3.  Defendant Leveraged Hawk, Inc. ("Leveraged Hawk") is a corporation
formed under the laws of the State of Delaware and having its principle place of business
located, upon information and belief, at 1679 South DuPont Highway, Suite 100, Dover,
Delaware and/or 20 Exchange Place, 4505, New York, New York 10005. Leveraged Hawk
conducts business in New York and received the unlawful transfers from HSBC through its New

2

York bank account. Muho purports to be the self-appointed investment advisor to Leveraged Hawk.

## JURISDICTION AND VENUE

4.       This Court has jurisdiction over this action pursuant to Title 28, United States Code, Section 1332(a)(2) in that there is complete diversity of citizenship between Plaintiffs and Defendant, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.       Venue is proper in the Southern District of New York pursuant to Title 28, United States Code, Sections 1391(b)(1) and 1391(c).

## FACTUAL ALLEGATIONS

### Muho's Employment with and Termination from The Richcourt Funds

6.       Fletcher Asset Management ("FAM") is an investment advisor managing a group of hedge funds known as the Fletcher Funds. RF Services, LLC ("RF Services") is a financial services firm affiliated with the Funds.

7.       Muho was hired to work as an Associate for RF Services in May 2012.

8.       Thereafter, in August 2012, Muho was hired to work as a consultant with Asset Holding Company 5, a management company affiliated with RF Services.

9.       Between August and November 2012, Muho was appointed to the Board of Directors of Soundview Elite, Ltd. ("Soundview") and Vanquish Fund, Ltd. ("Vanquish"), among other affiliated funds associated with RF Services (together the "Richcourt Funds").

10.       On January 3, 2013, Muho was arrested in New York City and charged with reckless endangerment and driving while intoxicated, after allegedly fleeing from New York City Police officers and instigating a high speed chase to avoid being stopped by them.

3

6424199v.1

These charges against Muho are currently pending with the New York County District Attorney's Office.

11.     Between January and April, Floyd Saunders, Corporate Secretary for the Funds, and his colleagues developed concerns about Muho's ability to perform his professional duties based on Muho's increasingly erratic behavior, arrest for reckless conduct, absence from the office, and frequently incomprehensible communications. This behavior prompted Saunders to suggest to Muho that he step down from the Board of Directors of Soundview and Vanquish as well as the other Richcourt Funds.

12.     On April 3, 2013, Muho submitted his resignation in writing from the Board of Directors of Soundview, among other entities within the Richcourt Funds.

13.     Following his resignation, Muho started his own venture which has no connection to the Richcourt Funds.

14.     Specifically, in April 2013, Muho created Leveraged Hawk, a corporate entity that he owns and controls. Leveraged Hawk is a putative Delaware corporation that Muho has both designated as a "private equity fund" and registered with the SEC as of May 31, 2013.

15.     On May 10, 2013 Muho was removed as a Director of Vanquish by written shareholder resolution of the Company.

16.     As of May 10, 2013 Muho had either resigned or been formally removed by resolution from each and every one of the Richcourt Funds. Accordingly, Muho had no authority to act in any manner on behalf of the Funds, including exercising any control over the assets of the Funds.

4

## Muho's Attempt to Transfer Funds from Wilmington Trust

17.     On April 29, 2013, however, Muho executed a series of fraudulent documents purporting to re-establish his ability to act on behalf of each of the Richcourt Funds. On each of these documents, Muho was the sole signatory and was on both sides of the transaction.

18.     With respect to each of the Richcourt Funds, Muho executed phony shareholder or director resolutions ostensibly:  (a) enabling each fund to be bound by the signature of one Director;  (b) removing the other, actual Directors from each fund; and (c) appointing Leveraged Hawk, Muho's worthless shell company, as a Director of each of the funds.

19.     The same day, April 29, 2013, Muho executed still another phony document titled "Universal Litigation Pursuit Agreement," or, alternatively, "Subscription Agreement."  In that document, Muho purports to act as the sole authority on behalf of the Richcourt entities.  The fraudulent Subscription Agreement states that the Richcourt Funds named therein agreed to "transfer US $5,000,000, to Leveraged Hawk," and that four affiliated investment advisors agreed to transfer "the voting shares the Investment Managers hold in" the funds in exchange for shares of Leveraged Hawk common stock – Muho's entity that he had created less than 30 days prior to this attempted asset transfer.

20.     Muho intended to use the fraudulent Subscription Agreement to misappropriate and convert monies in 19 of the Richcourt Funds' accounts, including Soundview, located at Wilmington Trust in Delaware.

21.     On May 7, 2013, in an effort to cloak his conduct in legitimacy, Muho purported to sign a "Resolution" allegedly bestowing upon himself the authority to undertake the

5

wire transfer from the Richcourt Funds to his company, Leveraged Hawk. Muho executed Wire

Transfer Agreements authorizing Wilmington Trust to transfer daily monetary amounts from

various Richcourt Fund accounts and attempted to effect transfer of funds from Wilmington

Trust to Leveraged Hawk.

22.     On June 10, 2013, a New York City lawyer acting on behalf of the

Richcourt Funds contacted Wilmington Trust again advising the bank that "the instructions and

documentation provided . . . by Muho are fraudulent and of no force and effect."

23.     To date Wilmington Trust has not effected the fraudulent transfer of funds

to Leveraged Hawk as directed by Muho. Citing disparate instructions regarding management of

the Richcourt Funds' accounts, Wilmington Trust commenced an interpleader action in Delaware

Superior Court on June 17, 2003. That action is filed under Civil Action No. N13C-06-156.

24.     Several weeks after Muho's failed attempt to transfer funds to his

company, on June 14, 2013, Muho filed a claim for unemployment benefits with the State of

New York, naming RF Services as his former employer. Three days later Muho filed another

claim for unemployment benefits with the State of New York, this time naming Fletcher Asset

Management as his former employer.

25.     On July 30, 2013, during a teleconference held in connection with the

Wilmington Trust case proceedings Muho represented to a Delaware Superior Court Judge that

he was unable to retain Delaware counsel to represent him in the action due to financial

insolvency.

## Muho's Transfer of Funds from HSBC To Leveraged Hawk

26.     Soundview and Vanquish Funds each maintain a bank account with HSBC

Private Bank in Monaco.

6

27.     The authorized signatories on these two accounts are (a) Stewart Turner
and Denis Kiely for Soundview and (b) Stewart Turner and Floyd Saunders for Vanquish. Muho
is not an authorized signatory on these accounts; nor is Leveraged Hawk an authorized
beneficiary of the accounts.

28.     On or about August 8, 2013, Plaintiffs obtained a debit advice from HSBC
identifying that $2,067,377.24 was transferred on August 8, 2013 from Soundview's HSBC
account to a Citibank account of which Leveraged Hawk was the beneficiary.

29.     Additionally, upon information and belief, Plaintiffs presume that Muho
has transferred funds from Vanquish's HSBC account to Leveraged Hawk.

30.     Neither the transfer from the Soundview account nor suspected transfer
from the Vanquish account were authorized by any representative of those Funds or any of the
Richcourt Funds.

31.     On August 15, 2013, just one week after Muho fraudulently induced
HSBC to convey funds to Leveraged Hawk, and two weeks after Muho declared to Delaware
Superior Court that he could not afford counsel, Muho "suddenly" obtained the resources to
engage counsel to represent Leveraged Hawk in the above-referenced Wilmington Trust
Delaware action.

32.     By letter dated August 14, 2013, the Richcourt Funds provided notice to
HSBC of the unlawful transfer.

33.     Moreover, by letter dated August 19, 2013, counsel for the Richcourt
Funds informed Leveraged Hawk's Delaware counsel that to the extent it had received any funds
from Muho or Leveraged Hawk, it may be in possession of stolen money.

7

34.     The Richcourt Funds are also preparing to make an official report of Muho's fraudulent activities to federal law enforcement authorities, and have made a report to the New York law enforcement authorities.

## FIRST CAUSE OF ACTION
### CONVERSION
### (AGAINST ALL DEFENDANTS)

35.     Plaintiffs repeat and reallege paragraphs 1-34 above as though set forth fully herein.

36.     Plaintiffs have complete ownership and right to possession of the funds contained in the HSBC bank accounts of Soundview and Vanquish.

37.     Defendants Muho and/or Leveraged Hawk have interfered with Plaintiffs' ownership and possession of the funds held in the Soundview HSBC account in that they have effected an unauthorized and unlawful transfer of $2,067,377.24 to Leveraged Hawk for their own use.

38.     Defendants Muho and/or Leveraged Hawk have interfered with Plaintiffs' ownership and possession of the funds held in the Vanquish HSBC account in that they have effected unauthorized and unlawful transfers of funds from that account for their own use.

39.     Defendants Muho's and Leveraged Hawk's conduct was extreme and outrageous, essentially amounting to theft.

40.     As a result of Muho's and Leveraged Hawk's conversion of funds rightfully belonging to Plaintiffs, the Funds have been deprived of the use of their assets. Plaintiffs' inability to access or use the funds held in the subject accounts has resulted in significant damages.

8

6424199v.1

41.     Accordingly, Plaintiffs are entitled to full restitution of the amount wrongfully converted, as well as damages for the harm caused by the wrongful detention of Plaintiffs' assets and punitive damages.

**SECOND CAUSE OF ACTION
UNJUST ENRICHMENT
(AGAINST ALL DEFENDANTS)**

42.     Plaintiffs repeat and reallege paragraphs 1-41 above as though set forth fully herein.

43.     In the manner described above, Defendants Muho and/or Leveraged Hawk have received ill-gotten gains in an amount of $2,067,377.24 or more as a result of their unlawful activities.

44.     It is not just, equitable, or conscionable for Defendants to retain the funds received in the aforementioned manner, and as a consequence Defendants have been unjustly enriched.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays that judgment be entered in its favor against Defendants Muho and Leveraged Hawk and that Plaintiffs be provided the following relief:

1.     damages to the Plaintiffs for all of their losses, including punitive damages, attorneys' fees, and reasonable costs of suit, that have resulted from Defendants' wrongful conduct, regardless of where such conduct has occurred;

2.     final judgment requiring Defendants to pay full restitution to each party that has been harmed by the wrongful conduct;

9

3.      final judgment imposing a constructive trust on all funds and properties of Defendants that are the funds or traceable to the funds of the unlawful activities of Defendants in an amount of $$2,067,377.24, or according to proof;

4.      an asset freeze and/or an attachment be placed on all funds, negotiable instruments and/or assets held in any bank, brokerage, or other accounts, certificates of deposit, safe deposit box, or otherwise, in the name of either or both Defendants, or for the benefit of either or both Defendants directly or indirectly;

5.      such and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues in this action.

DATED:  September 27, 2013
        New York, New York

By: _____
    Peter C. Harvey
    PATTERSON BELKNAP WEBB & TYLER LLP
    1133 Avenue of the Americas
    New York, New York 10036
    Phone:  (212) 336-2000
    Fax:  (212) 336-2222
    Email: pcharvey@pbwt.com

    *Attorneys for Plaintiffs Soundview Elite LTD.,
    and Vanquish Fund Ltd.*

10

# EXHIBIT C

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
### FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Expires: | August 31, 2015 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)

Previous Names    [X] None

Entity Type

0001578347

[X] Corporation

Name of Issuer

Leveraged Hawk, Inc.

[ ] Limited Partnership

Jurisdiction of Incorporation/Organization

[ ] Limited Liability Company

DELAWARE

[ ] General Partnership

Year of Incorporation/Organization

[ ] Business Trust

[ ] Over Five Years Ago

[ ] Other (Specify)

[X] Within Last Five Years (Specify Year) 2013

[ ] Yet to Be Formed

---

### 2. Principal Place of Business and Contact Information

Name of Issuer

Leveraged Hawk, Inc.

| Street Address 1 | Street Address 2 |
|---|---|
| 20 EXCHANGE PL 4504 | |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| NEW YORK | NEW YORK | 10005 | (212) 480-0001 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Muho | Gerti | |

| Street Address 1 | Street Address 2 |
|---|---|
| 20 Exchange Pl 4504 | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| New York | NEW YORK | 10005 |

Relationship: ⌊ ⌋ Executive Officer [X] Director ⌊ ⌋ Promoter

Clarification of Response (if Necessary):

---

## 4. Industry Group

☐ Agriculture

Banking & Financial Services

☐ Commercial Banking

☐ Insurance

☐ Investing

☐ Investment Banking

[X] Pooled Investment Fund

☐ Hedge Fund

[X] Private Equity Fund

☐ Venture Capital Fund

☐ Other Investment Fund

Is the issuer registered as
an investment company under
the Investment Company
Act of 1940?

☐ Yes          [X] No

☐ Other Banking & Financial Services

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

Health Care

☐ Biotechnology

☐ Health Insurance

☐ Hospitals & Physicians

☐ Pharmaceuticals

☐ Other Health Care

☐ Manufacturing

Real Estate

☐ Commercial

☐ Construction

☐ REITS & Finance

☐ Residential

☐ Other Real Estate

☐ Retailing

☐ Restaurants

Technology

☐ Computers

☐ Telecommunications

☐ Other Technology

Travel

☐ Airlines & Airports

☐ Lodging & Conventions

☐ Tourism & Travel Services

☐ Other Travel

☐ Other

---

## 5. Issuer Size

Revenue Range          OR          Aggregate Net Asset Value Range

[X] No Revenues                     ☐ No Aggregate Net Asset Value

☐ $1 - $1,000,000                   ☐ $1 - $5,000,000

☐ $1,000,001 -                      ☐

☐ $5,000,000

☐ $5,000,001 - $25,000,000

☐ $25,000,001 - $100,000,000

☐ Over $100,000,000

☐ Decline to Disclose

☐ Not Applicable

☐ $5,000,001 - $25,000,000

☐ $25,000,001 - $50,000,000

☐ $50,000,001 - $100,000,000

☐ Over $100,000,000

☐ Decline to Disclose

☐ Not Applicable

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Rule 504 (b)(1)(ii)

☐ Rule 504 (b)(1)(iii)

☐ Rule 505

☒ Rule 506

☐ Securities Act Section 4(5)

☒ Investment Company Act Section 3(c)

☒ Section 3(c)(1)

☐ Section 3(c)(2)

☐ Section 3(c)(3)

☐ Section 3(c)(4)

☐ Section 3(c)(5)

☐ Section 3(c)(6)

☐ Section 3(c)(7)

☐ Section 3(c)(9)

☐ Section 3(c)(10)

☐ Section 3(c)(11)

☐ Section 3(c)(12)

☐ Section 3(c)(13)

☐ Section 3(c)(14)

---

## 7. Type of Filing

☒ New Notice    Date of First Sale 2013-04-29    ☐ First Sale Yet to Occur

☐ Amendment

---

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?    ☐ Yes ☒ No

---

## 9. Type(s) of Securities Offered (select all that apply)

☒ Equity

☐ Debt

☒ Option, Warrant or Other Right to Acquire Another Security

☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

☒ Pooled Investment Fund Interests

☐ Tenant-in-Common Securities

☐ Mineral Property Securities

☐ Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?      [X] Yes [ ] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $1,000,000 USD

## 12. Sales Compensation

Recipient

Gerti Muho

(Associated) Broker or Dealer [X] None

None
Street Address 1
20 Exchange Pl 4504

City

New York

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

Recipient CRD Number [ ] None

168066

(Associated) Broker or Dealer CRD Number      [X] None

None
Street Address 2

State/Province/Country

NEW YORK

[ ] All States     [X] Foreign/non-US

ZIP/Postal Code

10005

## 13. Offering and Sales Amounts

Total Offering Amount      $5,000,000 USD  or [ ] Indefinite

Total Amount Sold      $5,000,000 USD

Total Remaining to be Sold      $0 USD  or [ ] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:      [19]

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary): _____

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD ☐ Estimate

Clarification of Response (if Necessary): _____

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against it in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Rule 505 exemption, the issuer is not disqualified from relying on Rule 505 for one of the reasons stated in Rule 505(b)(2)(iii).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| Leveraged Hawk, Inc. | Gerti Muho | Gerti Muho | Director | 2013-05-31 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— )
                                          )
In re:                                    )          Chapter 11
                                          )
SOUNDVIEW ELITE, LTD., *et al.*,          )          Case No. 13-13098 (REG)
                                          )
                        Debtors.          )          (Jointly Administered)
———————————————————— )


BENCH DECISION[1] ON MOTIONS TO DISMISS,
FOR RELIEF FROM STAY, FOR APPOINTMENT
OF TRUSTEE, AND ON SANCTIONS FOR
CONTEMPT


APPEARANCES:

PORZIO, BROMBERG & NEWMAN P.C.
*Counsel for the Debtors*
100 Southgate Parkway
Morristown, New Jersey 07962
By:     Warren J. Martin, Jr., Esq. (argued)
        Mark J. Politan, Esq. (argued)
        Terri Jane Freedman, Esq.
        Rachel A. Segall, Esq.

MORRISON & FOERSTER LLP
*Counsel for the Joint Official Liquidators*
1290 Avenue of the Americas
New York, New York 10104
By:     John A. Pintarelli, Esq. (argued)
        James J. Beha, II, Esq. (argued)
        William H. Hildbold, Esq.

425 Market Street
San Francisco, California 94105
By:     Larry Engel, Esq. (argued)

---

[1]     I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate
in open court, but where the circumstances do not permit more leisurely drafting or more polished
discussion. Because they often start as scripts for decisions to be dictated in open court, they
typically have a more conversational tone.

-1-

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Counsel for Pasig Ltd.*
1633 Broadway
New York, New York 10019
By:    Andrew K. Glenn, Esq. (argued)
       Jeffrey R. Gleit, Esq. (argued)

OSTAD PLLC
*Counsel for Richcourt Allweather Fund Inc.; Optima Absolute Return Fund Ltd.;*
   *America Alternative Investments Inc.; Solon Group, Inc.; and Deborah Hicks Midanek*
185 Great Neck Road, Suite 330
Great Neck, New York 11021
By:    Karen Ostad, Esq. (argued)

WILLIAM K. HARRINGTON
*Office of the United States Trustee, Region 2*
201 Varick Street, Suite 1006
New York, New York 10014
By:    Richard C. Morrissey, Esq. (argued)


ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

        In this contested matter in the six jointly administered chapter 11 cases of Debtors

Soundview Elite, Ltd., Soundview Premium, Ltd., Soundview Star, Ltd. (together, the

"**Limited Debtors**"), Elite Designated, Premium Designated and Star Designated

(together, the "**SPV Debtors**," and together with the Limited Debtors, the "**Debtors**"),[2]

which are within the Fletcher Family of Funds, managed by Fletcher Asset Management,

under the leadership of Alphonse Fletcher ("**Mr. Fletcher**"), I have what are effectively

six motions before me:

---

[2]     The Debtors are mutual funds. I find that all were organized under the law of the Cayman Islands
        (as Cayman Islands "Exempted Companies"), principally for tax reasons. But I further find that
        their principal place of business is in the United States, at 48 Wall Street, in New York, New
        York, and that if a chapter 15 case with respect to them now were filed, their "center of main
        interests," or "**COMI**," would now be in New York as well.

-2-

(1) By Peter Anderson and Matthew Wright, the Joint Official Liquidators of the Limited Debtors (the "**JOLs**") and America Alternative Investments Inc., Optima Absolute Return Fund Ltd., and Richcourt Allweather Fund Inc. (the "**BVI Petitioners**"), pursuant to section 1112(b) of the U.S. Bankruptcy Code, to dismiss these cases (or, under section 305 of the Code, to abstain), in favor of a liquidation proceeding in the Cayman Islands—or alternatively, pursuant to section 362(d) of the Code, to grant relief from the stay to allow the Cayman insolvency proceeding to proceed;

(2) By the United States Trustee Program ("**U.S. Trustee**"), pursuant to sections 1104(a)(1) and (2) of the Code, to appoint a chapter 11 trustee;[3]

(3) by the Debtors, pursuant to sections 362 and 105(a) of the Code, for entry of an order:

(a) declaring that section 362 of the Code applies to proscribe proceedings in the Cayman Islands;

(b) finding the JOLs and petitioning creditors Citco Global Custody (N.A.) N.V. ("**Citco**"), the BVI Petitioners, the Solon Group, and the latter's principal Deborah Hicks Midanek to have acted in contempt of the U.S. automatic stay, and

---

[3] The U.S. Trustee's motion for appointment of a chapter 11 trustee was initially accompanied by a similar motion by Pasig, Ltd. ("**Pasig**"), a creditor and party-in-interest. But Pasig thereafter changed its position, and now supports dismissal or relief from the stay to allow the liquidation to be accomplished in the Cayman Islands by the JOLs. The U.S. Trustee's motion was filed after I advised the parties that I wanted them to brief the desirability of the appointment of a chapter 11 or chapter 7 trustee as an additional option.

(c) imposing sanctions upon them for having done so.

The various motions raise a host of issues, some of which raise mixed questions of fact and law, and others of which raise matters of the Court's discretion. For the reasons set forth below, I conclude that:

(1)  The cases were filed with sufficient corporate authority, as required under the articles of organization of the six Debtors here.

(2)  I should not dismiss the cases under section 1112(b), either for "bad faith" filing or for unenumerated cause, nor wholly abstain under section 305.

(3)  The Debtors' existing management should not continue in possession; one or more independent fiduciaries must be appointed for the Debtors in these cases. I find, as a mixed question of fact and law, that the U.S. Trustee and Pasig were plainly right when they argued that cause has been shown for the appointment of a trustee under each of sections 1104(a)(1) and (a)(2).[4]

(4)  The U.S. automatic stay became effective immediately upon the filing of the chapter 11 petition in the U.S. I grant the requested declaration to that effect. I must reject the JOLs' principal argument to the contrary; the fact that the Cayman Islands Monetary Authority ("**CIMA**") supported an insolvency petition commenced by parties acting in their

---

[4]   Related to that is the separate question of whether I should appoint a trustee here in the United States, under circumstances where the JOLs were already appointed under Cayman law (albeit under an order that, from the perspective of U.S. law, was void, for reasons discussed below), and where the JOLs could perform some, but not all, of the tasks that I see as necessary here. The latter issue is so important that I discuss it separately.

# EXHIBIT E

Gerti Muho
1100 Biscayne Blvd. 5303
Miami, Florida 33132
Phone: + 1 212 480 00 01
Facsimile: + 1 888 292 73 95
gm@gmcapital.net

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/28/14

SOUNDVIEW ELITE LTD., AND
VANQUISH LTD.,

                              Plaintiffs,

        -against-

GERTI MUHO, AND
LEVERAGED HAWK, INC.

                              Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 13 cv 06895 (AT)

*Emergency Motion to Dissolve TRO issued ex-parte October 22, 2013*

---

Emergency Motion to Dissolve Temporary Restraining Order and Motion to Dismiss for Insufficiency of Process—Unauthorized Issuance.

1. Defendant Gerti Muho moves the Court to dismiss the action on the ground that the process in this action is insufficient in that the summons in this action was issued unlawfully by attorney Peter C. Harvey, an unauthorized person for both Plaintiffs.

2. the Court is unable to provide Plaintiff relief where Plaintiff fails to allege this court has subject matter jurisdiction to provide Plaintff relief.

3.      Defendant *Gerti Muho* moves the Court to dismiss this action and dissolve the ex-parts TRO issued October 22, 2013 on the ground that Plaintiff's fails to allege that Plaintiff is authorized to institute or maintain this action.

4.      Defendant Gerti Muho alleges that plaintiff Soundview Elite Ltd. and Plaintiff Vanquish Ltd. are are not themselves corporations organized in this or in any U.S. state, despite allegations by Plaintiff of Plaintiff being domiciled and having their principal place of business located in New York, at 48 Wall Street, 4th Floor, despite both Plaintiffs ever paying any filing or license fees to the Ste of New York, and both lack capacity to bring this suit under the law of the State of New York.

Respectfully submitted,

Gerti Muho
Pro-Se
1100 Biscayne Blvd. 5303
Miami, Florida 33132
Phone: + 1 212 480 00 01
Facsimile: + 1 888 292 73 95
gm@gmcapital.net

Defendant Gerti Muho states, pro-se, that:

## PRELIMINARY STATEMENT

Defendant Gerti Muho ("**GM**" "**Investment Adviser**" "**Adviser**") respectfully submits this memorandum of law and three supporting Affidavits Defendants incorporate herein: *Supporting Defendants Affidavit No. 01: Key Events Leading to Leveraged Hawk, Inc. Surviving the Richcourt Funds and the Richcourt Management Companies. Timeline Charts Included, Supporting Affidavit No. 02: The Founding of GM Capital Management, Inc.*: and *Supporting Affidavit No. 03: GM Threatened Away From New York and Sued Ex-Parte Under False Oaths*, all (i) in support of Defendants motion pursuant to Fed. R.Civ.P. 65(b) to dissolve ex-parte temporary restraining order entered October 22, 2013 and (ii) in support Defendants motion to dismiss this action on the grounds listed herein.

This lawsuit arises from a financial transaction GM Capital Management, Inc., an SEC registered investment advisory firm, and real party in interests for both named Plaintiff funds, undertook last August to close bank accounts Plaintiff's held in blatant violation of U.S. Securities and Tax laws; Defendant Investment Adviser representative has been personally charged together with Delaware fund Leveraged Hawk, Inc. ("**Leveraged**') stand charged of theft and unjust enrichment by disgruntled minority shareholder Fletcher Asset Management, Inc.

This case represent another vexatious lawsuit filed by Peter Harvey and Buddy Fletcher to (i) cut GM Capital's access to funds, (ii) to get a court order in a state they knew I had long left saying I'm a thief, (iii) to force me to come to New York for a bogus depositions information

on accounts only they can access—so as to force me to come to New York, in person, so their cop friends could charge me for state law crimes and rob me of my freedom too—teaching me a lesson, destroying the one who chose to serve his investors over the two, for all to see, and destroying the credibility of who they know is the government's strongest witness against them —I spoke to my FBI contact a week or two ago and he assured me neither Buddy nor Harvey had approached them about my 'theft', and that he would be altered if they would, and (iv) to swap any recovery they are assured of their tricks will get, since they've lead me to my near destitute state (Harvey laughed last week when I told him I had no electricity) out of Soundview Elite and my investors hands into Vanquish, a shell of a fund, they want to use to funnel recoveries into their own pockets. Vanquish has as much right to Soundview's funds and Peter Harvey and Buddy Fletcher do—none, and coincidentally GM Capital is that dead fund's legal party in interest too.

This complaint must be dismissed on numerous legal grounds; or so it appears to me, a non-attorney forced to file this motion pro-se (need and not choice). The facts muddy and confuse this case. And since they're largely irrelevant, I leave them for last.

## SUMMARY OF GROUNDS FOR DISMISSAL

The Complaint is subject to dismissal under Fed. R. Civ. P. 12(b)(1) because there is no basis for this Court to exercise subject matter jurisdiction over this matter. Plaintiff alleges no federal cause of action and diversity jurisdiction simply cannot be met with Plaintiff and Defendant Leveraged Hawk, Inc. both domiciling in the State of New York. The Complaint is subject to dismissal for Defendant Adviser under Fed. R. Civ. P. 12(b)(2) because this court has no personal jurisdiction over Florida residents. The Complaint is subject to dismissal under Fed.

R. Civ. P. 12(b)(3) because there is no substantial connection between this venue and the dispute. Finally, the Complaint is subject to dismissal under Fed. R. Civ. P. 12(b)(6) because it does not even come close to satisfying pleading standards and because the claims asserted suffer from defects which require their dismissal with prejudice.

In addition, Plaintiff lacks standing to assert this claim because the alleged injury was to Soundview Elite, a subsidiaries of subsidiaries of subsidiaries. The sole basis for plaintiffs to assert injury is that they hold equity in the Bermuda entity that held a minority stake in a Bahamas entity that holds all the equity of the British Virgin Island parent of four failed investment management entities that sold their control of Soundview Elite to Leveraged Hawk, Inc. months ago, unchallenged. Because the only purported injury may come to defendants from damages to the end-of-the-line control subsidiary, such a claim is not direct and may be asserted only as a derivative claim. But the entity in which plaintiffs owned an interest was not harmed by the alleged conversion at all and actually benefitted from Defendants use of the funds to sue former managers Citco Group, Ltd and Fletcher Asset Management, Inc. for more than $200 million in damages the unregistered managers sought to get away with. Plaintiff may possibly allege a multiple-derivative mismanagement claim, but had made no mismanagement allegations.

## THE COURT MUST DISMISS A CASE THAT IS NOT PROSECUTED IN THE NAME OF THE REAL PARTY IN INTEREST.

Alphonse Fletcher, Jr., Floyd Saunders, Patterson Belknap Webb & Tyler LLP, Fletcher Asset Management, Inc., Fletcher Asset Management, George Ladner, Peter C. Harvey, Jane Metcalf, Citibank N.A., and any other members of the group prosecuting this action—not one,

not all stand to represent Soundview Elite Ltd.'s and Vanquish's real interests. None of them prosecute this action in the name of the real parties in interest. GM Capital Management, Inc., unnamed in this action and the only SEC registered investment advisory firm of any of the persons I've listed—adviser of funds that include named Plaintiff and more  is the only party that can stand to represent the Plaintiffs as their real party in interest.

The first sentence of Rule 17(a) provides: "An action must be prosecuted in the name of the real party in interest," which has been interpreted to mean the party entitled to enforce the right under the controlling substantive law. The party enforcing the right is not necessarily the party who will benefit from any recovery. The party seeking to enforce the right must be the real party in interest not simply with respect to the original claim **but also with respect to counterclaims, crossclaims, injunctive relief, and intervening claims.**

Plaintiff appears to allege it acts pursuant to corporate secretaries, and law firm associates. It's claims as to authority are shifty. Fletcher Asset Management, Inc. does not list either Soundview elite Ltd. or Vanquish Fund Ltd. as a fund it controls.

Failure to list either fund on its Schedule D of its form ADV suggests Fletcher Asset Management, Inc. is not the funds legal representative in the United States, and while it chooses to file suit here for the Plaintiff funds, it provides no proof that is is the real party of interest with counter claims, crossclaims, intervening claims, etc.

EXPERT FROM FORM ADV REQUIRES PLAINTIFF TO APPOINT AN AGENT FOR SERVICE OF PROCESS FOR THE FUNDS. THERE IS ONE BUT ONE: GM CAPITAL MANAGEMENT, INC. AND DEFENDANT INVESTMENT ADVISER.

"By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are

submitting a *notice filing,* as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings,* demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded,* directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing.*

### Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize *any person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives."[1]

## THE COURT MUST DISMISS THIS CASE FOR THE PLAINTIFF IS NOT THE REAL PARTY OF INTERESTS.

Plaintiff does not have standing to represent the listed funds duly merged into Leveraged Hawk, Inc. and Plaintiff failed to timely attack by June 9, 2013—the last day Plaintiffs could have attacked the merger but did not. *See Damon Alarm Corp. v. American Dist. Tel. Co.,* S.D.N.Y. 1969, 304 F.Supp. 83. (Delaware corporation which was absorbed in New York corporation as

---

[1] FORM ADV

result of statutory merger went out of existence when merger became effective and action could not be maintained against it by service of process after effective date of merger).

## THE COURT MUST DISMISS THE CASE MUST DISMISS THIS CASE ON JURISDICTION GROUNDS.

1. **THIS COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER THIS MATTER AND MUST DISMISS THIS CASE.**

### A. THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS CASE BECAUSE PLAINTIFF HAS NOT ALLEGED A FEDERAL CAUSE OF ACTION.

Federal district courts have subject matter jurisdiction over a case when "federal law creates the right of action and provides the rule of decision." Mims v. Arrow Financial Servs., LLC, slip op. at 8 (U.S. Jan. 18, 2012). A suit "arises under" federal law when the plaintiff's statement of the cause of action shows that it is based upon federal law. *Vaden v. Discover Bank*, 129 S. Ct. 1262, 173 L.Ed. 2d 206, 2009 U.S. LEXIS 1781 (2009). Plaintiff makes no such allegations.

Plaintiff fails to allege a right of action whose rule is provided by federal law. Plaintiff's complaint alleges conversion and unjust enrichment. Neither conversion nor unjust enrichment is a federal cause of action. Both alleged causes of actions are state law causes of action, and, as such, don't confer to this court federal question jurisdiction. *Ippolito v. Lennon*, 542 N.Y.S.2d 3, 6 (App. Div. 1989). See *Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (second alteration in original) (quoting *Citibank, N.A. v. Walker*, 787 N.Y.S.2d 48, 50 (N.Y. App. Div.

2004), abrogated on other grounds by *Butler v. Catinella*, 868 N.Y.S.2d 101, 101 (N.Y. App. Div. 2008).

### B. THE COURT LACKS DIVERSITY JURISDICTION OVER THIS CASE.

**1. Plaintiff Allege No Relevant Facts Why The Effective Certificate of Merger Filed with the Secretary of State of the State of Delaware Should Be Completely Ignored— Magically Set Aside.**

The court lacks diversity jurisdiction over this case. Diversity jurisdiction requires complete diversity between all plaintiffs and all defendants. See *Casas Office Machines v. Mita Copystar America, Inc.*, 42 F.3d 668, 673 (1st Cir.1994). Defendants challenge Plaintiff's jurisdictional allegations. Specifically, Defendants challenge allegations by Plaintiff that Soundview Elite Ltd. continues as a going concern—i.e., that the unchallenged Certificate of Merger duly filed with the Secretary of State of the State of Delaware merging Plaintiff funds into Leveraged Hawk, Inc. is invalid. That despite Fletcher Asset Management Inc. and Plaintiff's (assuming for a moment the two are not one and the same) both of which's knowing failure to challenge the Effective Certificate of Merger legally makes Leveraged Hawk, Inc. the legal surviver of Plaintff funds and more can be ignored. That a reason exists to set aside the certificate despite the certificate's being filed in compliance with all competent laws and un-challengeable by any one entity—man, woman, child, or Buddy Fletcher, a minute after June 9, 2013. Assuming Plaintiff can allege why U.S. federal and state laws should be turned upside down, the certificate of merger can be ignored and that the Certificate of Meger for a reason should not here be conclusive on the issue of whether Soundview Elite continues as a going

concern in the United States. It doesn't. It's survived by Leveraged Hawk, Inc. No shareholder, not even Buddy Fletcher can rewrite lost rights—ex attorney general or not.

**2. Even If the Certificate of Merger is Magically Set Aside to Handicap the Stronger Legal Team (pro-se), Plaintiff Has Not Alleged Diversity.**

Assuming millions in legal fees can put together one reason why the unchallenged certificate of merger should be ignored. Assuming Plaintiff can succumb the first unsuccumbable task and prove Soundview Elite continues as a going concern—or not assuming but just destroying Plaintiff's comeback to the merger even without the certificate of merger. As if the legally filed document just never existed.

No certificate, arguendo. Hate giving it away. Plaintiff fails to allege diversity jurisdiction; still no Federal jurisdiction—still the Court must dismiss. Defendants challenge Plaintiff's allegations that Soundview Elite is not domiciled in New York.

Plaintiff itself alleges, openly in the complaint that Soundview Elite is located on Wall Street.[2] It's address is 48 Wall Street, Fourth Floor, New York, NY 10005. It's only address is on Wall Street. It's only address if Fletcher Asset Management's address, and technically has not been Plaintiff since Leveraged bought control of Plaintiff, assets,  liabilities and all April 29, 2013. Defendant wholly agrees that before merging with Leveraged Hawk, Inc. in April Plaintiff's center of all interests were New York.

Plaintiff alleges the same in its complaint. Plaintiff doesn't allege it is not domiciled in New York—I assume it lets the court assume an exotic name cannot be domiciled in N.Y. For purposes of diversity jurisdiction, citizenship is based on domicile—not exotic names. *Linardos*

---

[2] These allegations by Plaintiff of New York domicile contradict earlier allegations Fletcher Asset Management made in Wilmington's Delaware.

*v. Fortuna*, 157 F.3d 945, 947 (2d Cir.1998); *Newman--Green*, 490 U.S. at 828. "Domicile is the place where a person has his true and fixed home and principal establishment, and to which, whenever he is absent he has the intention of returning." *Linardos*, 157 F.3d at 948. A P.O. Box in Cayman cannot be a person's principal establishment. Plaintiff fails to allege it even alleged leases a P.O. Box in Cayman or elsewhere.

Plaintiff must allege the entities legal existence with proof required by law, Plaintiff bears the burden of proving, by a preponderance of the evidence, the facts supporting jurisdiction. *Bank One v. Montle*, 964 F.2d 48, 50 (1st Cir.1992); *O'Toole v. Arlington Trust Co.*, 681 F.2d 94, 98 (1st Cir.1982); *Garcia–Perez*, 208 F.Supp.2d 200; *Palermo v. Abrams*, 62 F.Supp.2d 408, 410 (D.P.R.1999) Casellas, J. ( [t]he party invoking subject matter jurisdiction must support its allegation of jurisdiction by "**competent proof**") (emphasis added).

Federal courts "are not at liberty to overlook limitations on their subject matter," *Francis v. Goodman*, 81 F.3d 5, 8 (1st Cir.1996), but rather are required to strictly construe those statutes which grant their jurisdiction, *Garcia–Perez v. Santaella* 208 F.Supp.2d 200, 203 (D.P.R.2002). *See also Alicea–Rivera v. SIMED*, 12 F.Supp.2d 243, 245 (D.P.R.1998). In cases in where diversity of citizenship is the sole basis for invoking subject matter jurisdiction, without a preponderance of the evidence establishing diversity, the district court would lack judicial power to adjudicate the controversy. *Francis, 81 F.3d at 6.*

Plaintiff provides  no proof—let alone competent proof to establish legal existence and the Court must dismiss this case.

**3.     Plaintiff dooms diversity jurisdiction with allegation of its New York domicile, conclusively and the Court must dismiss the case.**

Leveraged Hawk, Inc. survives Plaintiff by operation under U.S. law for all purposes. If once more one is force to just ignores that fact, for the mental exercise again for just a moment again, Plaintiff has forever dooms diversity jurisdiction by alleging its New York domicile in its complaint—conclusively so, and the Court must dismiss the case.

Even if Plaintiff can show Plaintiff has interests outside New York and outside the U.S. that allow Plaintiff to conjure up the appearance of having a foreign domicile, maybe a boat—the Court cannot ignore Plaintiff's New York domicile allegations. Plaintiff will then have two domiciles. And where dual domiciles exists, only the American domicile determines diversity.

The law on persons with multiple citizens is hardly esoteric: "In matters of diversity jurisdiction American citizenship will determine diversity...only the American nationality of the dual citizen should be recognized under *28 U.S.C. § 1332(a)*." *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 504 (2d Cir. 1991); see also *Lemos*, 5 F. Supp. 2d at 165 ("[T]here is an emerging consensus among courts that, for a dual national citizen, only the American citizenship is relevant for purposes of diversity jurisdiction under 28 U.S.C. § 1332.") (internal quotation marks and citations omitted); *Fuerst*, 832 F. Supp. 2d at 217 (same).

Thus, when a party is a dual citizen domiciled abroad, as is the case here, courts can never have diversity jurisdiction. This is so because (i) the party is a citizen of no state and thus there is no jurisdiction pursuant to § 1332(a)(1) and (ii) the foreign citizenship of the party is not recognized and thus there is no diversity pursuant to § 1332(a)(2). *See Fuerst*, 832 F. Supp. 2d at 217 ("[D]iversity jurisdiction may be properly invoked only when a dual citizen's domicile, and thus his citizenship, is in a [U.S.] state diverse from that of adverse parties.") (internal quotation

marks and citations omitted); *Lemos*, 5 F. Supp. 2d at 165 (holding that because the plaintiff, who was a dual citizen of Greece and the United States, was not domiciled in the United States "she [was] a citizen of no state for the purposes of diversity jurisdiction"); *Lehman Gov't Secs*, 1996 WL 447995, at *2 (concerning a party who was a dual citizen of the United States and Israel and domiciled in Israel: "Since diversity jurisdiction is to be determined on the basis of [a dual citizen's] American citizenship, but he is not a citizen of a state, he cannot sue a citizen of state in the absence of federal question jurisdiction."). *Lehman Gov't Secs*, 1996 WL 447995, at *2 (concerning a party who was a dual citizen of the United States and Israel and domiciled in Israel: "Since diversity jurisdiction is to be determined on the basis of [a dual citizen's] American citizenship, but he is not a citizen of a state, he cannot sue a citizen of state in the absence of federal question jurisdiction.").

It is a prerequisite of state citizenship (a stated requirement of the statute) that a person be a citizen of the United States. See Scott v. Sandford, 60 U.S. (19 How.) 393,405 (1857). 86. See Del., Lackawanna & W. R.R. v. Petrowsky, 250 F. 554 (2d Cir. 1918). See Hammerstein v. Lyme, 200 F. 165 (W.D. Mo. 1912); Sadat v. Mertes, 615 F. Supp. 1176 (7th Cir. 1980) (and cases cited). 28 U.S.C. § 1332(a). The Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, tit. II, § 201(a), 125 Stat. 762 (Dec. 7, 2011), states that "the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and who are domiciled in the same State."

And the Jurisdiction and Venue Clarification Act of 2011 precludes jurisdiction if the foreign citizens or subjects are lawfully domiciled in the same state as the U.S. plaintiff. See Pub.

L. No. 112-63, tit. II, § 201(a), 125 Stat. 762 (Dec. 7, 2011} (amendment to 28 U.S.C. § 1332(a)).

### 4. Defendants Fault To Properly Allege Diversity In Proper Form And The Court Must Dismiss This Case.

Diversity Cannot be Alleged on Information and Belief. It is well-established that diversity of citizenship "should be distinctly and positively averred in the pleadings, or should appear with equal distinctness in other parts of the record." *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 47 (2d Cir. 1996) (internal citation omitted); *Ganoe v. Lummis*, 662 F.Supp. 718, 723 (S.D.N.Y 1987) ("The party seeking to invoke federal jurisdiction on the basis of diversity must affirmatively allege the existence both of diversity of citizenship and the requisite amount in controversy."); *R.G. Barry* 612 F.2d at 655 ("the burden falls squarely upon the removing party to establish its right to a federal forum by competent proof.").

Indeed, courts hold that allegations of federal subject matter jurisdiction may not be made on the basis of information and belief; rather, they must be made on personal knowledge. *Am.'s Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1074 (7th Cir.1992) (only affidavits made on personal knowledge, and not claims made " 'to the best of my knowledge and belief,' " are sufficient to establish citizenship for jurisdictional purposes); *See Virtual Worlds, LLC v. Seaboard Int'l Energy Corp.*, No. CV 10-4432 PA (JCGx), 2010 WL 2553468, at *2 (C.D. Cal. June 18, 2010) ("Because Removing Defendant has alleged Plaintiff's citizenship on 'information and belief,' the Notice of Removal's allegations are insufficient to establish Plaintiff's citizenship."); *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001)

("Absent unusual circumstances, a party seeking to invoke diversity jurisdiction should be able

to allege affirmatively the actual citizenship of the relevant parties."); Vail v. Doe, 39 F. Supp. 2d

477, 477 (D.N.J. 1999) (stating citizenship allegation that is upon information and belief "does

not convince the Court that there is diversity among the parties"); Lewis v. Consol. Freightways

Corp., No. 04-6102, 2005 WL 503317, at *1 (E.D.Pa. 2005) (stating citizenship allegation that is

upon information and belief is insufficient).

   **Plaintiff's cannot conjure up new facts so as to allege a basis for diversity
jurisdiction if he did not on the face of the complaint, and the Court is required to dismiss
this case.**

   Plaintiff fails to allege diversity jurisdiction. Plaintiff's failure to allege jurisdiction is

fatal to this Court's jurisdiction. Plaintiff is required to have alleged justification on the face of

the complaint; the face of the complaint must be sufficient to show federal subject matter

jurisdiction (that is, the answer or special defenses are not sufficient to afford subject matter

jurisdiction). See Am. Natl Red Cross v. S.G., 505 U.S. 247 (1992) See also Exxon Mobil Corp. v.

Allapattah Servs., 545 U.S. 546 (2005); Holmes Grp., Inc. v. Vornado Air Circulation Sys., 535

U.S. 826 (2002); Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355 (2002); Textron Lycoming

Reciprocating Engine Div., Avco Corp. v. United Auto., Aero. & Agric. Implement Workers of

Am., 523 U.S. 653. Grupo Dataflux v. Atlas Global Grp., LP., 541 U.S. 567 (2004) (affirming the

longstanding rule that subject matter jurisdiction in diversity cases depends on the state of facts

that existed at the time of filing, where a party's post-filing change in citizenship did not cure the

lack of subject matter jurisdiction). But, as the Court notes in Newman-Green, Inc. v. Alfonzo-

Larrain, 490 U.S. 826 (1989}.

5. Leveraged Hawk, Inc. is a Delaware C-corporation headquarted and registered with the Secretary of State of New York to operate in the State of New York. See also Form D filed with the Securities and Exchange Commission stating the active fund is based in New York.[3]

6. GM Capital Management, Inc. a New York based investment advisory firm register with the U.S. Securities & Exchange Commission—the only registered investment adviser actually even if we include non-party Fletcher Asset Management, Inc. See GM Capital Management, Inc.'s FORM-ADV, linked below and accompanying affidavits.[4]

7. Plaintiff falsely alleges I reside in New York. Claims in complete disregard of truth and justice to have even served me in person in New York—causing me so, so much harm and pain, personal and professional with this order. I do not. If I did as Plaintiff alleges diversity jurisdiction fails because ever single party is New York based.

8. Plaintiff falsely alleges I reside in New York. I do not. See affidavits. Adding a defendant the Court has no personal jurisdiction over fails to create diversity jurisdiction all other parties are domiciled in New York and the Court Must Dismiss this Case.

C.   PLAINTIFF DEFRAUDED THIS COURT BY ALLEGING, BASELESSLY AND SO, SO RECKLESSNESS THAT THIS COURT HAD PERSONAL JURISDICTION OVER ME AND THAT MY USUAL PLACE OF "ABODE" IS MY GRANDMOTHER'S ADDRESS; THIS COURT HAS NO PERSONAL JURISDICTION OVER ME, PERSONALLY, AND MUST DISMISS THIS CASE—AND IMMEDIATELY PLEASE DISSOLVE THE MONTHS OLD, EX-PARTE TRO THAT HAS LEFT ME WITHOUT LIGHTS ETC. SEE ACCOMPANYING AFFIDAVITS.

1.   Insufficient Process FRCP 12(b)(4) and Insufficient Service of Process, FRCP 12(b)(5) require this Court to dismiss this case with prejudice.

---

[3] http://www.sec.gov/Archives/edgar/data/1578347/000157834713000001/xslFormDX01/primary_doc.xml

[4] http://www.adviserinfo.sec.gov/iapd/content/viewform/adv/sections/iapd_AdvIdentifyingInfoSection.aspx?ORG_PK=168066&RGLTR_PK=50000&STATE_CD=&FLNG_PK=000F29A40008016B0572F5600468FFA9056C8CC0

Plaintiff claims to have served me at my grandmother's house, assuming Plaintiff tried to serve me at at all. I wasn't in New York at the time. I wasn't served. I don't know if my grandmother was served. She doesn't read well and she doesn't purport to be my representative. She also doesn't speak one word of English. It is maddening that I go hungry at times and have been left penniless for months by my misguided adversaries ill-willed goals. Goals that try to make me personally bound to judgments I had no part of and do not bind me. See Taylor v. Sturgell, 553 U.S. 880 (2008), in which the Court applies the traditional rule that no person is "bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a part}' by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). A claim that the recipient of service was not authorized to receive it may be raised by a motion to dismiss. *Santos v. State Farm Fire & Casualty Co.*, 902 F.2d 1092, 1095 (2d Cir. 1990). I never authorized another person to accept service for me personally, and the Court must dismiss this suit for failure of service of process.

I noticed among my private bank documents and my driving records Peter Harvey seems to provide to this Court on a weekly basis, that certain e-mails have popped up that insinuate to this Court service of process appears to have been provided to me via e-mail by my ill-hearted adversaries. Since slamming my reputation with private bank documents, e-mails, investments, and, well, whatever irrelevant information Buddy and Peter conjure up to attack my character, it would have been fantastic if the two had also provided the court that certain e-mail I have included as part of Affidavit 4, Exh 24, that the two never answered. Maybe the ex-parte TRO they forced this Court to issue with their lies was to be my answer.

E-mails post-dating the issuance of the ex-parte TRO's that insinuate notice are wholly irrelevant to whether I was made a part of the process that forced me bound without any service of process, as required under the law. Now I thank Mr. Harvey for sending me around Christmas time some documents about this case. He should have also included in that e-mail the affidavits Floyd Saunders and Jane Metcalfe swore on this court. I looked thoroughly for those affidavits and could not find them in the document bunch Harvey sent me for Christmas. I didn't care much after all about some driving case I refused to settle a year ago for even 300$$ as I recall. And one would think affidavits used to destroy one's business ex-parte; affidavits by Floyd Saunders and a complete stranger that go even further than the lies Floyd Saunders told the Wilmington Court should have been sent to me. I think they should be part of the Christmas e-mail process. They weren't, and the e-mails were no process. It's not that they post date the TRO by months. It's not that e-mail can't provide process, either. If I had had just one of the ten law firms I beat before the current one appeared, I wouldn't mind the law firm working via e-mail to expedite all process. But I don't have that law firm. I don't have a way to know what needs to satisfy process. I'm not a lawyer and know nothing of litigation. And there's a kick to that: I'm not a lawyer, and I don't have a lawyer. I don't have a lawyer and I'm not a lawyer because while skipping to Court to sue Wilmington Trust June 17, 2013, I received an e-mail that looked like process, wasn't process, I was told was process, that caused me to take as process, and led to me not to sue for my funds as I should and could but caused me to turn home, cry, and continue my nightmare. If I was spending millions GM Capital is the only party legally responsible for, I would have herds of lawyers and maybe I wouldn't complain about even e-mails shown this Court that insinuate, but don't provide process. Sorry. See Armco, Inc. v. Penrod-Stauffer Bldg.

Sys., Inc., 733 F.2d 1087, 1089 (4th Cir. 1984) (where the defendant did not acknowledge service by mail, "there was no valid service of process, the district court was without jurisdiction of the defendant, and the default judgment was void").

**Plaintiff's Unjust Enrichment Claims Should t0o be Dismissed with Prejudice.**

Plaintiff offers nothing to show that defendants' defendants' receipt of the funds and expenditures, and payments made to the fund's sole registered investment adviser and benefits received constitute unjust enrichment. Defendant further has established in the affidavits that Plaintiff is already in receipt of consideration that far exceeds payments made by Plaintiff to Leveraged Hawk, Inc, if one can even call the transfers to the entity purchasing control of Plaintiff payment. Transfers that domesticated funds and brought Plaintiff steps closer to complete legal compliance, and the end of Plaintiff's continual exposure to criminal liability. Even if consideration turns out to have been less than fair, Defendant in his affidavits establishes enrichments if any were anything but unfair. Allegations the Plaintiff's themselves do not appear to dispute, and have not alleged in any instance.

Plaintiff's Conversion Claim is Estopped for Failure to Timely Prosecute on a timely manner despite Plaintiff failing on numerous times to allege the same in order to avoid bringing Plaintiff in suits created for the purpose of attacking and weakening Plaintiff to attack 5 months later in this case.

SUMMARY OF FACTS RELATED TO PLAINTIFF'S CONVERSION CLAIM.

This case began last year. In April of last year, I exercised the fiduciary authority I owed shareholders and stakeholders of Richcourt Holding, Inc., of four holding companies, and of sixteen or so hedge funds and accepted on behalf of Richcourt Holding, Inc. one thousand Class

A common shares of co-defendant Leveraged Hawk, Inc. ("Leveraged"). The Class A shares represented all issued and outstanding Class A shares of Leveraged, and made Richcourt Holding, Inc. the owner of ten percent of Leveraged's vote and seventy-five percent of its earnings.

Before the sale Richcourt Holding, Inc. was millions underwater but held one hundred percent of the vote. In a myriad of other transactions, I gave investors and beneficial owners of the funds $115 million in assets ninety percent of the vote. They had had none. I then gave the funds their first ever, aligned-in-interests, and SEC Registered Investment Advisory firm, in the funds two decades, or GM Capital Management, Inc. I then merged away twenty one or so entities, the four holding companies and the sixteen or so funds companies, all into surviving Leveraged. All right. All in good faith. And benefitting all involved.

I quickly assured Alphonse Fletcher Jr. ("Buddy") I would still welcome his advice. Buddy controls Fletcher Asset Management, Inc. ("FAM"). FAM was once SEC registered but for two years has been just off. FAM is a non-controlling shareholders of Richcourt Holding, Inc.'s parent entity. And I even offered to support his proxy Deborah for a seat on Leveraged's Board.

I honestly hoped Buddy would have accepted my offer. The man's a rare genius. Unfortunately my attempt at appeasement failed. Buddy and his proxy Deborah flat out refused, unfortunately.  FAM, Citco, Deborah, and a whole host of phantom "managers" wanted to direct the funds assets what appears were just catastrophic returns for the funds investors. To FAM, Citco and other manager's gains, though.

But FAM & Co. appeared in May to be succumbing to a bitter understand of its new non-managing shareholder place. For years FAM claimed to the SEC and others it had no control over the funds management. And now it really didn't. I asked FAM and it's law firms to return my investors funds—millions I had sent them between January and April from Leveraged—most paid to the very law firms Buddy had so selfishly then advised.

The law firms didn't return my investors funds, but it appeared they had started, like dominoes, to recuse themselves from almost a dozen in April, to what appeared a month to be but a very few—Weill Gotshall, Walkers, Ritch & Connolly, and the lawyer that came to replace Cohen & Gresser. Peter C. Harvey and Patterson and the whole bunch of law firms that popped up months later had never been affiliated with the merged funds. Peter Harvey was a loyal Fletcher fund lawyer after all, and Fletcher and his funds paid Patterson a flat fixed monthly fee each month.

I provided FAM, Deborah, and the world with the all the documents that established my authority over the funds. I registered and listed the all the funds on GM Capital Management Inc.'s SEC registration that is made publicly available to all on the SEC's website. The very same documents that the law abiding HSBC Private Bank in Monaco and Switzerland had their lawyers review for a month before the August transfer that led to this case in September-October. I openly claimed legal entitlement to the management of every penny of the funds $120 million in April. I informed Wilmington Trust April 30 to immediately inform the authorities should FAM, or Floyd or anyone other than myself attempt to move. I allowed that bank the time to be thorough in May, worked with the government, and in all enjoyed the sense of security that FAM had accepted its fate. That FAM—with millions in its coffers and with every premier law firm at

its disposal, never shy in court, clearly must have bitterly accepted. FAM could have easily challenged my authority and dominion at any moment—and did not. Clearly I should have no fear to meet my investors need for a legal representative they could at anytime sue and hold responsible, should they see the need for.

For at least five years before I sent my investors a letter in January 2013, my investors had never had a piece of writing from either FAM or Citco—or anyone. No one in years it appears claimed any responsibility to my investors over their funds. Noone had ever had control.

I claimed control. I made it public. I did it understanding that I would be held responsible for every penny that every one fund held from that day on. $120 million I alone accepted responsibility for. FAM appeared to have accepted defeat. I heard FAM proxy Deborah had claimed the agreement I had signed on behalf of the parties involved in the merger looked funny and not legitimate, but a challenge to my agreements was the last thing I worried for.

FAM had lost the ability to access all funds since April. Had every ability to, but filed no suit. Led me to believe that it accepted my dominion over the assets. That it would, if needed sue me as a shareholders, and that I needed not fear vexatious suits. That it would not, many many months later claim I was a thief. That since it could have challenged my legal rights in April and May, and did not. That I had not quivered as I had claimed ownership of all the funds, and told it it did not.

But FAM's acceptance for months of my authority in silence turned out to be bitterly false. FAM lured me to then at the end of May destroy my last enemy and FAM's last stand: proxy Deborah H. Midanek. Deborah I heard whispers was leading the challenge to my authority, claiming I had never removed her as director. Again, why whisper you unjust evil

FAM lady. So I sat down at the end of May and gave Deborah 3 reasons why she was never appointed a director:

> (i) that she had failed to consent prior to my consent March 12th and Buddy's consent March 22nd or so, as required by offshore law,

> (ii) that while the pertinent jurisdictions recognize both de-jure and de-facto directors on companies boards, they did not recognize de-facto director claims by non-individuals, but by corporations serving as directors—as Deborah had required she serve, and

> (iii) that while it is true that there existed resolutions signed by me and Buddy—that consent to Deborah's company joining the funds boards (the funds directors had no real control but she was a being a pest), if she noticed I had consented that Deborah's

company join as director on the 12th and Buddy on the 22nd. And reminded here that having had a boards two directors both having consent to her company's joining of the funds board, did not mean the Board of Directors ever consent to her company joining those Boards, as required for before one can be appointed a director of a board. This meant should I have informed her that my consent had been withdrawn at a time or another between the 12th and the 22nd, she would have had each director at a time consent but never both at the same time and never the board.

I gave FAM proxy Deborah that May 29th three equally sufficient reasons to stop her whispering.

And with my only whisperer out of the way I marched on Wilmington Trust and to success for having saved the funds, Leveraged, and my investors unopposed even if I stood alone without counsel. I held best title to the $120 million. FAM deprived of all access to every penny.

It stood by with a dozen law firms and millions of dollars. Never filed a suit. Never claimed me a drunk. Never a thief. For months doing nothing after my open seize that robbed them of the control they had no right to keep.

But it sues in September. Ex-parte without service or notice. And it points not to the months it had stood by while I held title to 60x what it now claims made me a thief, but to an in-personam interpleader case in civil court in Wilmington Delaware where every piece of dirt and lie had been thrown at me.

FAM Proxy Deborah, FAM, and Wilmington Trust file thousand of pages attacking and mocking me. The old law firms are gone. New names, and as I read their endless filings new stories appear. I steal supplies, I am an employee, a drunk, fired by a Secretary, and that grandest of them all: that FAM proxy Deborah alleges she was now appointed months later, April 10th. And her appointment is made by fancy shiny resolutions with fancy words no fund had ever used before. And boy do they attack me. But they don't name me, and without a lawyer I can't fight back.

Soon dozens of law suits pop-up worldwide: Citco, FAM, and a whole host of new characters, each repeating each others lies against me.

These grown man's thrill of having robbed this kid—me, by legal might, if not legal right is exhibited by a letter Peter Harvey rushes to write the attorney he has learned has agreed to represent me.

Claiming I have stolen money under exotic sounding statutes out of none other than HSBC, Peter tells the attorney that he will make sure every one that touches a penny, even one penny will be without a doubt giving it all back. That I had no money. And that I had said so

myself when I had tried to represent myself in Wilmington a few weeks ago. That the Judge had shown me and told me that I wan't a party and that if I had no money, too bad. That I stole to pay for legal representation and that that is the only explanation of how I could be able to afford to pay a firm of such a stature that my attorney happened to be. Mr. Harvey has no idea how much I'm paying the guy, but Mr. Harvey can't afford me fighting back. Horrible. And Mr. Harvey in that suit  filed for Summary Judgement attacking me entirely, the one party not named as a source of vexation in the interpleader.

Then after legal maneuvering that is too fantastic to believe, two months after having first been called ex-parte a thief and five months after I openly informed them all I was the only one who could access all funds, not a thief but the investors only legal representative. For the first three months they watched me threaten them away from my investors money, then the next two months they joined and sued Leveraged while picking every character flow they could plausible allege and throw it at me. And a month later, after they had filed suits across enough jurisdiction and had enough court documents with flows about me, they file this case against me. Ex-parte, and push their claims a bit further against me and request I go to weird places, and spend as many days as necessary for depositions they don't need, so they can put enough together to stick the label of prisoner on me. They file in federal court but go to the NYPD. They claim they will be heeding to federal police soon also. They have not as of mid January. Why?

Because Plaintiff waited five months to charge Defendant with conversion after staying completely quiet the first three months despite Defendant claiming best title to $120 million in assets, and attacks Plaintiff the next two months in court proceedings that deliberately leave

Plaintiff out, Plaintiff is estopped by Prosecution Laches from claiming in this action Defendnat commits laches.

I will end the focus on irrelevant facts by adding the following to address all my phantom crimes:

(i)     I spend $2 million to recover $200 million for my investors, thousand maybe misspent I myself I would say in frustration-- frustration law firm after law firm caused me by their inexplicable turning down of millions I offered them to represent me, the funds including Soundivew Elite, and the true investors and their best interests,

(ii)     I wasted precious time I should have used to file a certain suit in May against a certain Delaware bank, by helping three federal agencies understand as much as possible of the 300 plus gigabytes of new information FAM, Citco, and JP Morgan intentionally hid from them for amore than a decade; information that the government could have used to recover billions from the aforementioned three, and more, much more, from other reputable names in international finance. Oh, and I offered them my time, and the information, not for the 15-33% receeovery reward the agencies involved generally offer for this type of information. Nope, I knowingly forewent asking for bounties from the agencies that Congress thinks are needed to offer those weak snitches who must have no qualms about being paid to follow the law and without doing any work at all—and paid best of all with offers of 15%-33% of the monies recovered. I didn't even asked for the written guarantees against prosecution that are common in this type of work. This guarantee, of course, would have been of little value to me for I honestly thought and think I have never done justice the slightest wrong.  I offered my time, and my information for free

when I should have filed a suit for my rights. A suit that maybe would have prevented the harm I've since suffered.

## THE COURT MUST DISSOLVE THE EX-PARTE TRO ORDER PLAINTIFF DEFRAUDED THIS COURT TO ISSUE OCTOBER 22, 2013.

### A. STANDARD OF REVIEW

The standard for granting preliminary injunctive relief (as well as with regard to the issuance of a TRO) in the Second Circuit is well established. Plaintiff seeking such relief must show:

(a) irreparable harm and either:

(1) likelihood of success on the merits; or

(2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. (emphasis added)

Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979).

The standard discussed above is heightened in a situation in which the injunction will alter the status quo. In a case in which the Plaintiff seeks to alter the status quo, the Second

Circuit has stated that the Plaintiff must make a "clear" or "substantial" showing of a likelihood of success and a strong showing irreparable harm. Malkentzos v. De Buono, 923 F.SUPP. 505, 512 (S.D.N.Y. 1996). Defendants assert this heightened standard is applicable in this case.

## A. PLAINTIFF HAS NOT SHOWN IRREPARABLE HARM.

One of the cornerstones of a Plaintiffs request for a TRO centers upon Plaintiffs proving that the failure to receive injunctive relief will irreparably harm the Plaintiff. In this case, the Plaintiffs factual admissions coupled with the Defendants' submissions to this Court demonstrate that Plaintiff has not and cannot make this showing.

## CONCLUSION

Defendants assert that the issue for the Court at this point is whether the Court should continue its Order granting Plaintiff its Temporary Restraining Order, or whether the Court should dissolve the Order. Defendants assert the Court's review in consideration at this point, must take into account the fact that its initial Order is one that requires mandatory action changing the status quo. As such, the Plaintiff must make a clear of substantial showing of a likelihood of success and a strong showing of irreparable harm. Plaintiff has not met its burden in this case, and, therefore, Defendants request the Court grant the Relief requested in Defendants' Motion to Dissolve/Alternative Motion for Modification from Relief.

# EXHIBIT F

Peter C. Harvey
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York  10036
Phone:  (212) 336.2810
Facsimile:  (212) 226.2222
Email: pcharvey@pbwt.com

*Attorneys for Plaintiffs Soundview Elite LTD.,
and Vanquish Fund Ltd.*

- - - - - - - - - - - - - - - - - - - - - - - - - x   **UNITED STATES DISTRICT COURT**
                                      :   **SOUTHERN DISTRICT OF NEW YORK**

                                        :   Civil Action No. 13 cv 06895 (AT)

SOUNDVIEW ELITE LTD., and
VANQUISH FUND LTD.,                                                  :   **AFFIDAVIT OF FLOYD SAUNDERS**

                          Plaintiffs,          :

              -against-                                       :

GERTI MUHO and LEVERAGED
HAWK, INC.                                                                    :

                     Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - x

        FLOYD SAUNDERS, being duly sworn, does depose and say:

        1.      I am the Corporate Secretary for the Richcourt Funds, a group of private investment funds which includes Plaintiffs Soundview Elite Ltd. ("Soundview") and Vanquish Fund Ltd. ("Vanquish Fund").  I submit this Affidavit in support of the Plaintiffs' Motion for an Order of Attachment and Temporary Restraining Order Freezing Defendants' Assets and an Order Expediting Discovery. I have personal knowledge of the facts set forth in this Affidavit.

        2.      Fletcher Asset Management ("FAM") is an investment advisor managing a group of hedge funds known as the Fletcher Funds.  RF Services, LLC ("RF Services") is a financial services firm affiliated with the Richcourt Funds.

6428502v.1

### Gerti Muho's Employment History with the Richcourt Funds

3.      Defendant Gerti Muho ("Muho") was hired to work as an Associate for RF

Services in May 2012. (A true and correct copy of his offer letter for that position is attached to

this Affidavit as **EXHIBIT A.**)

4.      Thereafter, in August 2012, Muho was hired to work as a consultant with Asset

Holding Company 5, a management company affiliated with RF Services. (A true and correct

copy of his offer letter for that position is attached to this Affidavit as **EXHIBIT B.**)

5.      Between August and November 2012, Muho was appointed to the Board of

Directors of Soundview and Vanquish Fund as well as other entities within the Richcourt Funds.

(True and correct copies of Muho's Consent to Act as Director of Soundview and Vanquish Fund

are attached to this Affidavit as **EXHIBIT C.**)

6.      On January 3, 2013, Muho was arrested in New York City and charged with

reckless endangerment and driving under the influence, after allegedly engaging in a high speed

chase to avoid being stopped by officers of the New York City Police Department. (A true and

correct copy of the New York Criminal Court record of these charges is attached to this Affidavit

as **EXHIBIT D.**)

7.      Between January and April of 2013, my colleagues at the Richcourt Funds and I

developed concerns about Muho based on his increasingly erratic behavior, arrest for reckless

conduct, absence from the office and frequently incomprehensible communications. This

behavior prompted my colleagues and me to suggest to Muho that he step down from the Board

of Directors of the Richcourt Funds.

2

8.      On April 3, 2013, Muho submitted his resignation in writing from the Board of Directors of Soundview and other entities within the Richcourt Funds. (A true and correct copy of Muho's resignation from Soundview is attached to this Affidavit as **EXHIBIT E.**)

9.      After leaving the Richcourt entities, Muho started his own venture which has no connection to the Richcourt Funds.

10.      Specifically, in April 2013, Muho created an entity that he owns and controls: Defendant Leveraged Hawk, Inc. ("Leveraged Hawk"). Leveraged Hawk is a putative Delaware corporation that Muho has both designated as a "private equity fund" and registered with the SEC as of May 31, 2013. (A true and correct copy of the Form D filed for Leveraged Hawk, retrieved from the SEC's publicly-accessible database, is attached to this Affidavit as **EXHIBIT F.**) Muho did not advise me or my colleagues at the Richcourt Funds that he had created Leveraged Hawk.

11.      On May 10, 2013 Muho was removed as a Director of Vanquish Fund. (The May 10, 2013 Resolution of Vanquish Fund effecting Muho's removal is attached to this Affidavit as **EXHIBIT G.**)

### Muho's Initial Attempts to Steal Money from the Richcourt Funds

12.      Despite his resignation from Soundview, on April 29, 2013, Muho executed a series of fraudulent documents purporting to re-establish his ability to act on behalf of each of the Richcourt Funds. With respect to each of those Funds, Muho executed phony resolutions ostensibly: (a) enabling each Fund to be bound by the signature of one Director; (b) removing the other, actual Directors from each Fund; and (c) appointing Leveraged Hawk, Muho's shell company, as a Director of each Fund. (A true and correct copies of the above-referenced resolution relating to Soundview is attached to this Affidavit as **Exhibit H**).

3

13.     The same day, April 29, 2013, Muho executed still another phony document titled "Universal Litigation Pursuit Agreement," or, alternatively, "Subscription Agreement." In that document, Muho purports to act as the sole authority on behalf of the Richcourt Funds, including Soundview. Specifically, the document states that the Richcourt Funds named in the document agreed to "transfer US $5,000,000, to Leveraged Hawk," and that four affiliated investment advisors agreed to transfer "the voting shares the Investment Managers hold in [the Funds," in exchange for shares of Leveraged Hawk common stock – Muho's entity that he had created less than 30 days prior to this attempted asset transfer. Obviously, Leveraged Hawk has no assets and its stock is worthless. (A true and correct copy of the "Subscription Agreement" is attached to this Affidavit as **EXHIBIT I**.)

14.     By May 1, 2013 my colleagues at the Richcourt Funds and I learned for the first time that Muho had formed Leveraged Hawk. We also learned that Muho had attempted to transfer ownership of the Richcourt Funds to Leveraged Hawk. Additionally, we learned that Muho had boasted that he had "completed an inside takeover of Richcourt." (A true and correct copy of e-mail correspondence of May 1, 2013 detailing these events is attached to this Affidavit as **EXHIBIT J**.)

15.     Realizing that Muho was using the stationary and other documents of the Richcourt Funds for his own self-serving activities, on May 2, 2013 I sent a letter to Muho directing that he stop his unlawful conduct. I advised Muho that, because Fletcher Asset Management Inc., Richcourt Holdings Inc., and related or affiliated entities had terminated their relationship with Muho, he was required to, among other things, immediately "[c]ease and desist any efforts to act on behalf of the Companies," and "[r]eturn any files, folders, [or] documents" relating to the Companies in his possession. (A true and correct copy of that letter is attached to

4

6428502v.1

this Affidavit as **EXHIBIT K.**)   My goal was to protect the Richcourt Funds from a fraudulent transfer, and stop Muho from continuing to submit fraudulent documents to a federally insured financial institution.

16.     On May 7, 2013, Muho executed Wire Transfer Agreements that purported to authorize Wilmington Trust, N.A.—a Delaware bank with which several entities within the Richcourt Funds held custody accounts—to transfer $999,999,999 *per day* from Soundview's account.   That same day, Muho contacted Wilmington Trust and attempted to transfer $1 million from Soundview to his own entity, Leveraged Hawk.   (True and correct copies of the Wire Transfer Agreement and Muho's wire transfer instructions are attached to this Affidavit as **EXHIBIT L.**)

17.     On May 7, 2013, in a desperate effort to cloak his conduct in legitimacy, Muho purported to sign a "Resolution" allegedly giving authority to himself to undertake the wire transfer from the Richcourt Funds to Leveraged Hawk.   (A true and correct copy of the purported "Resolution" pertaining to Soundview is attached to this Affidavit as **EXHIBIT M.**)   In other words, Muho authorized himself to transfer the Richcourt Funds' money to himself by having the funds sent to the bank account of Leveraged Hawk, a company for which he is the sole owner and employee.

18.     Wilmington Trust did not complete the fraudulent transfer of funds to Leveraged Hawk as directed by Muho.   Citing disparate instructions regarding management of the Richcourt Funds' accounts, Wilmington Trust commenced an interpleader action in Delaware Superior Court on June 17, 2003.   That action is filed under Civil Action No. N13C-06-156

19.     In June 2013, weeks after Muho's failed attempt to transfer funds to his company, Muho filed a claim for unemployment benefits with the State of New York, naming RF Services

as his former employer. Days later Muho filed another claim for unemployment benefits with the

State of New York, this time naming Fletcher Asset Management as his former employer.  (True

and correct copies of communications from the New York State Department of Labor notifying

RF Services and Fletcher Asset Management of Muho's claims for unemployment benefits are

attached to this Affidavit as **EXHIBIT N.**)

<u>**Muho's Transfer of Funds from HSBC To Leveraged Hawk**</u>

20.      Soundview and Vanquish Fund each maintain a bank account with HSBC Private

Bank in Monaco.

21.      The authorized signatories on these two accounts are (a) Stewart Turner and

Denis Kiely for Soundview and (b) Stewart Turner and Floyd Saunders for Vanquish.  Muho is

not an authorized signatory on these accounts; nor is Leveraged Hawk an authorized beneficiary

of the accounts.

22.      On or about August 8, 2013, Plaintiffs obtained a debit advice from HSBC

identifying that $2,067,377.24 was transferred on August 8, 2013 from Soundview's HSBC

account to a Citibank account of which Leveraged Hawk was the beneficiary. (A true and correct

copy of the debit advice reflecting said transfer is attached to this Affidavit as **EXHIBIT O.**)

23.      Additionally, upon information and belief, I presume that Muho has transferred

funds from Vanquish's HSBC account to Leveraged Hawk.

24.      Neither the transfer from the Soundview account nor suspected transfer from the

Vanquish account were authorized by any representative of those Funds or any of the Richcourt

Funds.

6

25.   Soundview has suffered significant damage as a result of the deprivation of these

assets in that has been unable to pay numerous bills, causing disruption of its regular course of

operations.

FLOYD SAUNDERS

Sworn before me this
day of October 2013.

Notary Public
My commission expires
11/13/16

WALTER ARTHUR GOODE JR.
Notary Public, State of New York
Qualified in Nassau County
No. 01G06271946
My Commission Expires 11-13-2016

7

6428502v.1

# EXHIBIT G

# The New York Times

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers, please click here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now. »

October 17, 1982

# Miss Torres And Student Plan Nuptials

New York State Family Court Judge and Mrs. Frank Torres of New York have announced the engagement of their daughter, Analisa Nadine Torres, to Constantino Ramon Argimon, son of Mr. and Mrs. Constantino Argimon of Caracus, Venezuela.

An August wedding is planned.

The future bride, a second-year student at the Columbia University School of Law, was graduated from Miss Porter's School and magna cum laude from Harvard College. She was awarded the Harvard University Center for International Affairs Summer Research Fellowship in 1980. Her mother, Yolanda Marquez Torres, is a counselor in the department of special services of the College of the City of New York.

Miss Torres is the granddaughter of Felipe Neri Torres, retired judge of the Family Court of the State of New York; Mrs. Flerida Medina of New York, Dr. Cecil Marquez, retired associate professor of clinical medicine at the Columbia College of Physicians and Surgeons, and Mrs. Edward Archer of Norfolk, Va.

Mr. Argimon is an alumnus of the Colegio San Ignacio de Loyola of Rio Piedras, Puerto Rico, and Yale College. He expects to receive a master's degree in economics next year from the University of Massachusetts at Amherst. His father is a civil engineer with Proyecfin de Venezuela, S.A., a contractors in Caracas. His mother is a ceramacist.

Illustrations: Photo of Analisa Torres

# EXHIBIT H

Alphonse Fletcher, Jr.
48 Wall Street, Fourth Floor
New York, NY 10005
(212) 284-4800

FILED
U.S. BANKRUPTCY COURT

2014 JUL 30   P 3: 29

S.D.N.Y.

UNITED STATES BANKRUPTCY COURT SOUTHERN
DISTRICT OF NEW YORK

---

In re:

*SOUNDVIEW ELITE LTD., et al*

                 Debtors.

Chapter 11

Case No. 13-13098 (REG)

(Jointly Administered)

---

### ALPHONSE FLETCHER, JR.'S JOINDER IN PART
### IN THE CHAPTER 11 TRUSTEE'S OBJECTION TO THE MOTION TO DISMISS AND
### IN THE MUHO MOTION TO REMOVE THE CHAPTER 11 TRUSTEE

Alphonse Fletcher, Jr., a party-in-interest in this case, proceeding *pro se*[1] hereby

joins in part in the motion by Gerti Muho to remove the chapter 11 trustee (Docket 291) and

joins in part in the objection (Docket 299) by Corinne Ball ("Trustee"), chapter 11 trustee in the

cases *In re Soundview Elite, Ltd. et al,* to Gerti Muho's motion to dismiss these chapter 11 cases.

The Trustee described many of the compelling reasons why Mr. Muho's motion to dismiss these

proceedings and award control of the debtors should not be granted. Despite already accruing

expenses that exceed $3 million, more than 10% of the estate, the Trustee avoided addressing

other reasons why Mr. Muho's motion to dismiss should fail, reasons that justify Mr. Muho's

motion to replace the chapter 11 trustee. Though obscured by editing and excerpting, additional

details of the adverse role played by parties associated with Dakota Inc. and Angelo, Gordon &

Co. arise upon a review of Mr. Muho's activities which have so harmed these estates.

---

[1] I respectfully request that the Court accept these statements in spite of any procedural missteps including timing, structure, language, or other formalities. I humbly request that any parties aware of such shortcomings immediately inform me of such in the interests of protecting the integrity of the system.

The Fletcher March 21, 2014 Motion to Compel Compliance with Bankruptcy Code and Rules (Docket 481, "March 21 Motion") put the Court, the US Trustee program, and all parties on notice of undisclosed connections by parties associated with Dakota Inc. and $25 billion bankruptcy arbitrage hedge fund Angelo, Gordon & Co. whose founder is Dakota shareholder-treasurer John Angelo ("Dakota Parties"). Mr. Muho's activities and filings reveal coordination with, involvement of, and interference by at least five of the parties identified in the March 21 Motion, JPMorgan Chase, Weil, Gotshal Manges LLP, Morrison & Forester LLP, Pasig, Ltd., and Kasowitz Benson Torres & Friedman LLP. The March 21 Motion also summarized some of the disclosed and undisclosed connections of concern held by the Trustee and her advisors.

Soundview Trustee Corinne Ball and her law firm, Jones Day, attested to having no interests adverse to the estates. Yet it disclosed its current work for Soundview estate adversaries, including Citco (which filed Cayman Island wind up petitions against Soundview funds), JPMorgan Chase, Credit Suisse, HSBC, and others. Ms. Ball did not disclose other relevant work.

> Corinne Ball and Jones Day retention applications as Soundview fiduciaries did not include certain connections included in prior retention applications. Some of those connections are to parties that are targets for significant claims in these cases including Ernst & Young, Zolfo Cooper, D.E. Shaw, and Angelo Gordon, and News Corporation.[2]

The Trustee's financial advisor, Geoffrey Varga of Kinetic Partners, attested to having no interests adverse to the estates. Yet Kinetic disclosed current work for Soundview estates adversaries including Citco affiliates, Credit Suisse, and HSBC. It also disclosed previous work with five adversaries of the estates: Firefighters' Retirement System, Municipal Employees' Retirement System of LA, New Orleans Fire Fighters

---

[2] Applications to Employ Jones Day in *In re Tribune Company* 08-13141 (KJC), *In re AMR Corporation* 11-15463 (SHL), *In re Lehman Holdings Inc ,et al.* 08-13.555 (JMP)